Judge Rosemary Ledet
| iThis is a defamation case. The plaintiff, Dwayne Alexander, filed this suit against the Louisiana Board of Private Investigator Examiners (the “Board”) and James Englade, both in his individual capacity and in his official capacity as the Executive Director of the Board (collectively the “Defendants”). In this suit, Mr. Alexander asserted claims not only for defamation, but also for civil rights violations, abuse of process, and intentional infliction of emotional distress. Following a jury trial, the trial court entered judgment on January 6, 2015, in favor of Mr. Alexander and awarded $300,000 in damages. Mr. Alexander then filed a petition to annul the jury verdict; and the Defendants filed a motion for summary judgment on the petition to annul. The trial court granted the Defendants’ motion for summary judgment and dismissed Mr. Alexander’s petition to annul. From these judgments and rulings, both Mr. Alexander and the Defendants appeal. For the reasons that follow, we amend and affirm.
FACTUAL AND PROCEDURAL BACKGROUND
12In November, 1997, Mr. Alexander obtained a license to practice as a private investigator from the Board. Until November 2006, he held a valid private investigator license. When he was licensed, Mr. Alexander was subject to the rules and regulations governing the practice of private investigators, as promulgated and enforced by the Board and set forth in La. R.S. 37:3501 et seq. (“the P.I. Statutes”).
Soon after obtaining his license, Mr. Alexander formed his own private investigator company, World Wide Detective Agency, Inc. (“World Wide”); and he employed other investigators to work for him. In 2000, Mr. Alexander began performing contract work for the City of New Orleans (the “City”), investigating worker’s compensation claims. In 2006, Mr. Alexander entered into a contract with the City’s third party claims administrator, Cannon *550 Cochran Management Services, Inc. (“CCMSI”), to become their Disadvantage Business Enterprise (“DBE”) partner. From 2006 to February 2009, Mr. Alexander continued to investigate worker’s compensation claims for the City under his DBE contract with CCMSI. In November 2006, Mr. Alexander decided not to renew his private investigator license and allowed his license to expire. See La. R.S. 37:3517. According to Mr. Alexander, his work for the City under the DBE contract with CCMSI did not require him to be licensed as a private investigator given the exemptions enumerated in La. R.S. 37:3503(8)(b)(i), (iv), and (viii).[1]
laBefore his license expired in 2006, Mr. Alexander received two notices from the Board that complaints had been filed against him. Both complaints—the Phenix and Caesar complaints—involved allegations of professional misconduct against Mr. Alexander. The Board opened investigations into the two complaints, and Mr. Alexander was provided the opportunity to respond to the complaints. As of November 14, 2006, the date Mr. Alexander’s license expired, the Board’s investigation of the complaints was not completed. On December 6, 2006, the Board sent a letter to Mr. Alexander informing him that the two complaints filed against him had not been resolved as of the date that his license expired and that his license would not be renewed until a hearing was held with the Board’s investigatory officer. The letter further informed Mr. Alexander of the possibility that he “may have violated state criminal law during one of those investigations” and that the matter would be turned over to the State Police for investigation.
l4On February 16, 2009, the Board received a complaint letter and a large binder (“the Centanni Binder”) from a private investigator, Wayne Centanni. In the letter, Mr. Centanni complained that Mr. Alexander had been conducting private investigation work with CCMSI for the City without holding a valid license; and Mr. Centanni requested that the Board conduct a full investigation into Mr. Alexander and his business dealings. The Centanni Binder contained a background investigation of Mr. Alexander and his private investigator company, which consisted of a large volume of personal and professional information that Mr. Centanni had compiled from various sources. The Centanni Binder also included records obtained from the Board through a public records request filed by Mr. Centanni on February 12, 2009. The Board’s records disclosed information about Mr. Alexander’s license and his expunged criminal convictions, all *551 of which Mr. Centanni included in the Centanni Binder.
Mr. Centanni sent copies of the letter and the Centanni Binder to CCMSI, the City Attorney’s Office, the Metropolitan Crime Commission (“MCC”), Lee Zurik at WWL-TV, and several others.[2] Upon receiving the Centanni Binder, CCMSI contacted Mr. Alexander and held a meeting with him. At the meeting, Mr. Alexander informed of the Centanni Binder and its contents. Subsequently, in | ¿February 2009, Mr. Alexander’s DBE contract with CCMSI and the City was terminated.[3]
On February 27, 2009, the Board issued a cease and desist order directed to Mr. Alexander, which stated as follows:
Pursuant to the authority of La. R.S. 37:3522, the Louisiana State Board of Private Investigator Examiners orders that Dwayne Alexander, who the Board finds to be engaged in the practice of private investigation in the State of Louisiana in violation of La. R.S. 37:3500 et seq., be and is hereby ordered to cease and desist from such activity.
Annette Kovac, the Board’s Chairman, signed the cease and desist order. On March 4, 2009, the Board’s Executive Director, Mr. Englade, hand-delivered the cease and desist order to Mr. Alexander.
On May 12, 2009, Mr. Alexander sent two letters to the Board complaining that its actions—disclosing personal, confidential records to Mr. Centanni and issuing the cease and desist order without a hearing—resulted in the loss of his contract with CCMSI and the City. Mr. Alexander also filed a formal complaint with the Board against Mr. Centanni and submitted a public records request for the documents the Board furnished to Mr. Centanni.
In July 2009, Mr. Alexander filed suit against Mr. Centanni in Orleans Parish Civil District Court (“CDC”) alleging unfair trade practices. Mr. Alexander also filed suit against CCMSI in United States District Court for the Eastern | ¿District of Louisiana alleging wrongful termination.[4] Within a year of the lawsuits being filed, both were dismissed.
In January 2011, Mr. Alexander worked a contract job investigating a worker’s compensation claim for the St. Charles Parish School Board (the “School Board”). In May 2011, the MCC contacted the St. Charles Parish School Board Superintendent (the “Superintendent”) after receiving an anonymous tip that Mr. Alexander was conducting private investigations in St. Charles Parish without a valid license. The MCC informed the Superintendent that Mr. Alexander lacked a valid license to perform private investigator work and that, on February 27, 2009, he was issued a cease and desist order. The MCC also provided information about Mr. Alexander’s criminal background. Based on the information provided by the MCC, the Superintendent contacted the St. Charles Parish Sheriffs Office and requested that *552 an investigation be conducted into whether Mr. Alexander had a valid private investigator license at the time he performed work for the School Board.
In the course of his investigation, Captain Donald Smith of the St. Charles Parish Sheriff’s Office contacted the Board by email and explained the nature of his investigation. Captain Smith requested that the Board provide documentation as to whether Mr. Alexander held a valid private investigator license in January 2011. He also requested that the Board provide the relevant state statutes setting forth the 17penalty for conducting private investigations without a valid private investigator license. In response to his inquiry, Captain Smith received a phone call from Mr. En-glade. Mr. Englade informed Captain Smith that the Board had served Mr. Alexander with the cease and desist order in March 2009 and that order was still in effect. Mr. Englade further informed Captain Smith that if, in fact, Mr. Alexander had conducted private investigations in St. Charles Parish in 2011, he would be in violation of the P.I. Statutes. After that discussion, the Board faxed to Captain Smith a copy of the cease and desist order, the table of contents for the P.I. Statutes (La. R.S. 37:3500-25), and the statute providing the penalties for violating the P.I. Statutes (La. R.S. 37:3521). Based on his investigation, Captain Smith completed an arrest warrant affidavit,[5] charging Mr. Alexander with a violation of La. R.S. 37:3520[6] by providing contract or private investigator services to the Board without possessing a valid license. On June 23, 2011, an arrest warrant for Mr. | RAlexander was signed and issued by the Twenty-Ninth Judicial District Court in St. Charles Parish (“29th JDC”).
In October 2011, Mr. Alexander discovered the outstanding arrest warrant for him in St. Charles Parish. Upon discovering the arrest warrant, he turned himself in to the police. At the time of his arrest (on October 24, 2011), Mr. Alexander learned that he was being charged with conducting private investigation without a valid private investigator license. On the next day, October 25, 2011, the Times-Picayune newspaper reported on Mr. Alexander’s arrest as a result of the investigation by the St. Charles Parish Sheriffs Office into his work for the School Board in January 2011.
On December 19, 2012, the 29th JDC judge ordered the State to produce to Mr. Alexander the State’s evidence file in the criminal case against him on the charge of violating La. R.S. 37:3520.
*553 On January 14, 2013, Mr. Alexander filed the instant suit against the Defendants. Mr. Alexander averred in his petition that the Board and Mr. Englade, individually and in his official capacity, violated his constitutional rights and defamed him by issuing the cease and desist order in 2009. He also averred that the Defendants violated state public records laws and Board’s regulations by disclosing his expunged criminal records. Finally, he averred that the Defendants’ defamatory and tortious conduct against him was continuing and undiscoverable from 2009 until December 19, 2012, when he received the State’s evidence in the criminal case against him in the 29th JDC.
| ¡¡On March 5, 2013, the Defendants filed multiple exceptions, including no cause of action, prescription, and improper venue. Following a hearing on the exceptions, the trial court granted the Defendants’ exception of no cause of action and allowed Mr. Alexander twenty days to amend his petition to state a cause of action. The trial court also granted the Defendants’ exception of improper venue as to Mr. Alexander’s claims under the Public Records Act. The trial court denied the Defendants’ exception of prescription.
On May 31, 2013, Mr. Alexander filed a first supplemental and amended petition. In his amended petition, Mr. Alexander enumerated the following five causes of action: (1) slander and defamation (2006-2013); (2) defamation and slander (2011— 2013); (3) continuing defamation and slander per se; (4) damages for violation of state law affecting petitioner; and (5) breach of duty to investigate and disseminate truthful information.
On July 29, 2013, the Defendants filed a second set of exceptions, a motion for sanctions and attorney’s fees, and a motion to strike pursuant to La. C.C.P. art. 971. On September 20, 2013, these matters were heard by the trial court. In its October 16, 2013 judgment, the trial court overruled the Defendants’ exceptions of no cause of action and prescription and denied their motion to strike and motion for sanctions.[7]
ImOn December 10, 2013, the Defendants filed an answer and a reconventional demand. In their answer, the Defendants asserted multiple affirmative defenses, including discretionary immunity and quasi-judicial immunity. In their reconventional demand, the Defendants asserted a claim of abuse of process against Mr. Alexander.
On September 18, 2014, Mr. Alexander filed a motion for partial summary judgment on the issue of whether he was exempt from the P.I. Statutes, pursuant to La. R.S. 37:3503, while working under his DBE contract with the City from 2006 to 2009 and while working for the St. Charles Parish School Board in 2011. On October 8, 201, the trial court denied Mr. Alexander’s motion for partial summary judgment.
On November 3, 2014, the Defendants filed a motion for summary judgment seeking dismissal of Mr. Alexander’s claims and a judgment against Mr. Alexander on their reconventional claim of abuse of process. In their summary judgment motion, the Defendants also re-urged their exception of prescription and asserted quasi-judicial immunity and conditional privilege as a bar to Mr. Alexander’s claims against them. At the November 14, 2014 hearing, the trial court overruled the ex *554 ception of prescription, finding no reason to revisit the issue, and denied the motion for summary judgment, finding there were issues of material fact appropriate for a jury to resolve.
In December 2014, a jury trial was held in this matter. At the close of Mr. Alexander’s evidence and before the submission of the case to the jury, the h defendants moved for a directed verdict and dismissal of Mr. Alexander’s claims based on prescription. After brief argument, the trial court found “sufficient evidence of an interruption of prescription” and denied the Defendants’ motion for directed verdict. On the following day, the trial court instructed the jury on the applicable law and submitted a general verdict form with multiple jury interrogatories to the jury. The jury instructions and interrogatories set forth the following four causes of action against the Defendants for the jury to decide: (1) defamation; (2) abuse of process; (3) intentional infliction of emotional distress; (4) violation of a constitutional right under color of law. Neither Mr. Alexander nor the Defendants raised any objection to the jury instructions or jury interrogatories presented to the jury.
On December 18, 2014, the jury returned its verdict. The jury found the Defendants not liable on two of the four claims—intentional infliction of emotional distress and violation of Mr. Alexander’s constitutionally protected rights. The jury found the Defendants liable to Mr. Alexander for the other two claims—defamation and abuse of process—and awarded a total of $300,000 in damages. On January 5, 2015, the trial court entered judgment in accord with the jury’s verdict. Both the Defendants and Mr. Alexander filed motions for new trial. On March 10, 2015, the trial court denied both motions.
On January 30, 2015, Mr. Alexander filed a petition to annul the jury verdict based on fraud and ill practice under La. C.C.P. art. 2004. In his petition to annul, Mr. Alexander alleged that the jury verdict resulted from perjured testimony and 112fabricated evidence presented by the Defendants at trial. In response, the Defendants filed a motion for summary judgment, arguing that Mr. Alexander’s allegations of misconduct should have been raised in a motion for mistrial. On May 8, 2015, the trial court granted the Defendants’ motion for summary judgment and dismissed with prejudice Mr. Alexander’s petition to annul the jury verdict.
These two consolidated appeals followed.
DISCUSSION
Both the Defendants[8] and Mr. Alexan *555 der[9] raise several issues on appeal. For ease of discussion, we divided our analysis of the issues presented by the parties |1sinto the following seven categories: (i) prescription; (ii) defamation; (iii) immunity; (iv) excessive damages; (v) communications with the jury; (vi) motions for new trial; and (vii) petition to annul jury verdict. We separately address each category.
(i) Prescription
The Defendants contend that the trial court erred in denying the exception of prescription, which they raised before trial—by filing two peremptory exceptions and a motion for summary judgment—and before the submission of the case to the jury—by moving for a directed verdict. Each time the Defendants raised the exception of prescription, they argued that Mr. Alexander’s claims were prescribed pursuant to La. C.C. art. 3492, which sets forth the prescriptive period for tort-based cause of actions.
At the outset, we note, as the Defendants contend, that the applicable prescriptive period in this case is the one-year period under La. C.C. art. 3492. See Scott v. Zahero, 14-0726, p. 10 (La.App. 4 Cir. 12/3/14), 157 So.3d 779, 786 (holding that tort-based causes of actions generally are subject to a one-year liberative prescriptive period that commences to run from the day injury or damage is sustained).[10]
|14An exception of prescription is a peremptory exception that may be pleaded at any stage of the proceeding in the trial court before the submission of the case for a decision. La. C.C.P. arts. 927(A) and 928(B). The general rule is that “prescription statutes are strictly construed against prescription and in favor of the claim sought to be extinguished by it.” Bailey v. Khoury, 04-0620, p. 9 (La. 1/20/05), 891 So.2d 1268, 1275 (citing Bouterie v. Crane, 616 So.2d 657, 660 (La.1993)).
“Ordinarily, the party pleading the exception of prescription bears the burden of proving the claim has prescribed.” Hogg v. Chevron USA, Inc., 09-2632, p. 7 (La. 7/6/10), 45 So.3d 991, 998. If, however, prescription is evident on the face of the pleadings, then the burden shifts to the plaintiff to show that prescription has been interrupted or suspended and that the claim has not prescribed. Id.; see also Kelley v. General Ins. Co. of America, 14-0180, p. 6 (La.App. 1 Cir. 12/23/14), 168 So.3d 528, 534.
When evidence is introduced and evaluated at the trial of a peremptory exception of prescription, the trial court’s findings of fact are reviewed under the manifest error standard of review. Lomont v. Bennett, 14-2483, p. 8 (La. 6/30/15), 172 So.3d 620, 627.[11] Such is the ease here. The *556 Defendants re-urged the exception |15of prescription in a motion for directed verdict at the close of testimony and evidence at trial.[12] Thus, we review the trial court’s findings, as stated upon denying the motion for directed verdict and quoted below, under the manifest error standard.
In ruling upon the Defendants’ motion for directed verdict re-urging the exception of prescription of Mr. Alexander’s claims, the trial court stated as follows:
THE COURT: Okay. Well, this is the issue for me. It is not necessarily a continuing tort. It is every time it is published or any fashion by anyone to a third-party in the newspaper it is sounds of a new tort and that is how it is described as continuing, not necessarily continuing because the damages arises every time the publication occurs.
I think that there is sufficient evidence to establish a interruption of prescription or at the very least—I think it would be an interruption of prescription because every time there is a publication—I think there is a publication within the year filing the lawsuit. I think that—I will overrule the exception of prescription.
On appeal, the Defendants contend that the trial court erred in failing to grant their exception of prescription. The Defendants’ position is that Mr. Alexander had knowledge of their allegedly tortious, injury-causing conduct and any alleged injury or damages resulting therefrom in 2009, thereby commencing | ir,the one-year prescriptive period for Mr. Alexander’s tort claims. Thus, according to the Defendants, Mr. Alexander’s claims prescribed before the suit was filed on January 14, 2013.
Mr. Alexander counters that prescription was suspended by the doctrines of contra non valentón and continuing tort. In his petition, he relies on both doctrines. As to contra non valentem (the fourth category of that doctrine, which is called the discovery doctrine), he avers that the Defendants’ acts or omissions were “undis-coverable by plaintiff until December 19, 2012 when a district judge in the Parish of St. Charles ordered the State of Louisiana to produce to petitioner their evidence file in a matter before the 29th Judicial District Court entitled The State of Louisiana v. Dwayne^ Alexander.” As to the continuing tort doctrine, he avers that the Defendants’ conduct and the resulting damages *557 were continuous from 2009 until he filed this suit in 2013.
Ordinarily, “prescription runs against all persons unless exception is established by legislation.” La. C.C. art. 3467. The jurisprudence, however, recognizes limited exceptions to the running of prescription. As noted earlier, Mr. Alexander cites two of those exceptions—the continuing tort doctrine and the discovery doctrine (contra non valentem)—to argue that the one-year prescription period did not commence to run on his claims in 2009 and that his claims were not prescribed when he filed suit on January 14, 2013. We separately address each doctrine.

The continuing tort doctrine

|17The continuing tort doctrine is an exception to La. C.C. art. 3492 that applies when continuous tortious conduct causes continuing damages. Crump v. Sabine River Authority, 98-2326, p. 10 (La. 6/29/99), 737 So.2d 720, 728; Bustamento v. Tucker, 607 So.2d 532, 542 (La. 1992). For the continuing tort doctrine to apply, three requirements must be met—a continuing duty owed to plaintiff, a continuing breach of that duty by defendants, and a continuing injury or damages arising day to day. Crump, supra.[13] “The inquiry is essentially a conduct-based one, asking whether the tortfeasor perpetuates the injury through overt, persistent, and ongoing acts.” Hogg, 09-2632, 09-2635 at p. 16, 45 So.3d at 1003. If the alleged injury-causing conduct is discontinuous and terminates, but the plaintiff continues to experience injury in the absence of any ongoing activity by the tortfeasor, there is no continuing tort. Id.[14] “Both conduct and damage must be continuous” for the continuing tort doctrine to apply. Risin v. D.N.C. Investments, L.L.C., 05-0415, p. 8 (La.App. 4 Cir. 12/7/05), 921 So.2d 133, 138.
11RAccording to Mr. Alexander, the Defendants’ tortious, injury-causing conduct was continuous from 2009 until suit was filed and has caused continuous damages to him in the form of damage to his personal and professional reputation, loss of income, and violation of his constitutional rights of due process and privacy. Mr. Alexander contends that the Defendants continually breached their “duty to properly investigate, administrate, and disseminate truthful and accurate information” by disseminating the cease and desist letter, disclosing Mr. Alexander’s expunged crim *558 inal records, and failing to correct and disseminate “truthful information” about him.
We find no evidence of overt, persistent, and ongoing acts by the Defendants. Rather, the operating cause of all of Mr. Alexander’s alleged injuries and damages was the issuance of the cease and desist order and the disclosure of his expunged criminal records. These were discrete acts or discontinuous occurrences. The expunged criminal records were disclosed in response to public records requests made by Mr. Centanni and the MCC in February 2009. The dissemination of the cease and desist occurred initially when it was hand-delivered by Mr. Englade to Mr. Alexander on March 4, 2009; a copy was also received around that time by CCMSI and the City; a copy was also attached to Mr. Englade’s affidavit filed into the record of Mr. Alexander’s lawsuit against Mr. Cen-tanni on January 23, 2010; and the Board sent a copy to the St. Charles Parish Sheriffs Office on May 24, 2011, in response to a request for information by Captain Smith. Mr. Alexander introduced no evidence of any further dissemination 113of the cease and desist order, disclosure of his expunged criminal records, or any further damages after his arrest in October 2011.
In this case, the operating cause of injuries is the successive dissemination of alleged defamatory material. “To the extent the plaintiff claims that the damage he suffered as a result of the successive publications is continuing, we find the law is clear that the allegations of the plaintiffs petition cannot constitute a continuing tort.” Scott, 14-0726 at p. 12, 157 So.3d at 787; see also Neyrey v. Lebrun, 309 So.2d 722, 725 (La. App. 4th Cir. 1975) (hold that “[e]ach publication of a defamatory letter or statement results in a new and separate tort.”). The alleged tortious conduct involves separate and distinct acts rather than continuous or systematic acts.
We likewise find unpersuasive Mr. Alexander’s contention that the Defendants continuously breached their ongoing duties to investigate, administrate, and disseminate truthful information about him and willfully engaged in acts to hide truthful information about him. Mr. Alexander’s contention is that Mr. Englade, in particular, made false statements in his affidavit filed in the Centanni lawsuit, disseminated false information regarding the reasons for the cease and desist order and whether Mr. Alexander was exempt from licensure in 2009 and 2011, and intentionally failed to provide the St. Charles Parish Sheriffs Office with information about exemptions under the P.I. Statutes. Again, we find the record does not reveal any evidence of overt, persistent, ongoing acts by the Defendants. Mr. Alexander’s allegations involve discontinuous acts. Although the [ ^Defendants have a duty not to defame Mr. Alexander, “the breach of a duty to right an initial wrong simply cannot be a continuing wrong that suspends the running of prescription, as that is the purpose of every lawsuit and the obligation of every tortfeasor.” Hogg, 09-2632 at p. 23, 45 So.3d at 1007 (citing Crump, 98-2326, p. 10, 737 So.2d at 729).
This case is factually distinguishable from Risin and Lopez in which the failure to act constitutes a continuing wrong “as long as the offending object remains.” Risin, supra;[15] Lopez v. House of Faith Non-Denomination Ministries, 09-1147, *559 p. 7 (La. App. 4 Cir. 1/13/10), 29 So.3d 680, 684. In both Risin and Lopez, the operating cause of injury—the lead paint and the deteriorating building leaning onto plaintiffs property—-was overt and persistent and continued to cause successive damages day to day. In contrast, even assuming the cease and desist order contained false, defamatory statements, the Defendants’ failure to retract it or disseminate truthful information was not overt, persistent conduct causing successive damages day to day. Furthermore, each publication of the cease and desist or disclosure of the expunged records constitutes a separate, distinct tort; thus, even if plaintiff continued to suffer ill effects or damages from those acts, the continuing tort doctrine is inapplicable. See Hogg, 09-2632 at pp. 21-23, 45 So.2d at 1005-07; Crump, 98-2326, p. 10, 737 So.2d at 729. Thus, we find the continuing tort doctrine inapplicable here. Instead, we find the operating cause of Mr. Alexander’s alleged injuries and damages to be distinct, discontinuous acts by defendants, each with a corresponding one-year prescriptive period.

The discovery doctrine

As noted, Mr. Alexander also relies on the fourth category of contra non valen-tem, which is referred to as the discovery doctrine.[16] Under this category, “the doctrine of contra non will prevent the accrual of prescription when the plaintiffs cause of action is not known or reasonably knowable by the plaintiff, regardless of whether his ignorance is induced by the defendant.” Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW, § 10-4 (b) (1996). Addressing the issue of the amount of information needed to commence the prescriptive period under the discovery doctrine, the Louisiana Supreme Court in Jordan v. Employee Transfer Corp., 509 So.2d 420, 423 (La. 1987)—a case involving damages to a sunken den—reasoned as follows:
^Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury. When prescription begins to run depends on the *560 reasonableness of a plaintiffs action or inaction.
509 So. 2d at 428.
In determining whether the discovery doctrine applies here, we first note that the benchmark date for purposes of prescription is January 14, 2013—the date Mr. Alexander filed this suit. Mr, Alexander’s tort claims can be divided into the following three separate sets of actions by the Defendants:[17]
• February 2009—the Defendants responded to Wayne Centanni’s public records request;
• March 2009—the Defendants issued the cease and desist letter to Mr. Alexander; and
• May 2011—the Defendants disseminated the cease and desist letter to the St. Charles Parish Sheriffs Office, resulting in Mr. Alexander’s October 2011 arrest.
The discovery doctrine is inapplicable to the first two sets of acts—the February and March 2009 acts. Mr. Alexander acknowledges that in 2009 he knew of the Defendants’ alleged tortious acts of disclosing his expunged criminal records[18] and disseminating the allegedly defamatory cease and desist letter.[19] As | mto those *561 acts, Mr. Alexander had, or should have had, knowledge more than a year before filing suit. Thus, his claims as to those acts are prescribed. The same rationale applies to Mr. Alexander’s abuse of process claim, which is premised on the Defendants’ issuance of the cease and desist order, not its subsequent republication. The abuse of process claim is thus prescribed.
We, however, find merit to Mr. Alexander’s contention that the discovery doctrine applies to the third set of acts— the Defendants’ 2011 actions. As to the Defendants’ 2011 actions, Mr, Alexander testified that he accepted a job to investigate a worker’s compensation claim for the School Board that year. In October 2011, he completed the job. Thereafter, he learned that there was an active | ^warrant for his arrest in St. Charles Parish. On the day he learned of the warrant, Mr, Alexander went to the St. Charles Parish Sheriffs Office, spoke with the investigating officer, and turned himself in. When he turned himself in, Mr. Alexander requested to know the charge; he was told “doing private investigation work without a license.”
According to Mr. Alexander, he did not obtain any more information about either what the charge related to, or what information led to his arrest, until he received the State’s evidence file on December 19, 2012. Indeed, Mr. Alexander established, at trial, that on December 19, 2012, the district judge in his criminal ease ordered that the State to turn over their discovery file to him within forty-eight hours. Moreover, Mr. Alexander testified that, on the day he received the file, he discovered “information that [he] had never seen before,” including a report from the MCC that included Mr. Alexander’s expunged criminal records. In addition, Mr. Alexander testified that he learned for the first time that, on May 24, 2011, the Defendants had sent a copy of the cease and desist order to the St. Charles Parish Sheriffs Office, yet the Defendants had failed to provide the investigating officer with a full copy of all the relevant P.I. Statutes or to inform the officer that Mr. Alexander claimed to be exempt from licensure under the P.I. Statutes. Only upon receiving this information, Mr. Alexander testified, did he discover that the Defendants had continued to disseminate the fabricated cease and desist order, to violate his constitutional rights, and to act with the intent to cause damage to Mr. Alexander and his business.
1 ;5On cross-examination, Mr. Alexander acknowledged that he was aware of four Times-Picayune newspaper articles written about him—three published in July 2009 and the fourth published on October 25, 2011, the day after Mr. Alexander’s arrest. The fourth article related to the investigation and arrest of Mr. Alexander in St. Charles Parish; the article included the following passages:
The St. Charles Parish Sheriffs Office has arrested [Mr. Alexander] accused of performing unlicensed private investigator work for the St. Charles Parish School Board,
[[Image here]]
He had been wanted since June on a warrant for that charge, issued following an investigation by the St. Charles Sheriffs Office.
[[Image here]]
*562 The Metropolitan Crime Commission contacted St. Charles school Superintendent Rodney Lafon in May, according to the affidavit, at which time Lafon asked the Sheriffs Office to investigate.
[Mr.] Alexander had been served with a cease-and-desist order from the Louisiana State Board of Private Investigator Examiners in 2009 preventing him from conducting any type of private investigations, and that order was still in effect when he did the work for the School Board, according to the affidavit.
Again, Mr. Alexander’s contention is that he neither knew nor discovered sufficient information about the Defendants’ tortious conduct in connection with his October 24, 2011 arrest until December 19, 2012, when he received the State’s file. Given he filed suit within a year of that date, Mr. Alexander contends his claim was not prescribed. Defendants counter that Mr. Alexander knew or should have known no later than the date of his arrest, October 24, 2011, of the facts necessary to assert the claim against them. Since Mr. Alexander failed to file suit within a year of the date of his arrest, the Defendants contend his claim is prescribed.
126In applying the discovery doctrine, the jurisprudence has held that “[w]hen a plaintiff acts reasonably to discover the cause of a problem, “ ‘the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant.’ ” Chevron USA, Inc. v. Aker Mar., Inc., 604 F.3d 888, 893-94 (5th Cir. 2010) (quoting Jordan, 509 So.2d at 424). “The ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiffs action or inaction in light of his education, intelligence, and the nature of the defendant’s conduct.” Marin v. Exxon Mobil Corp., 09-2368, p. 15 (La. 10/19/10), 48 So.3d 234, 246; Griffin v. Kinberger, 507 So.2d 821 (La. 1987). Simply put, when the plaintiff relies on the discovery doctrine to suspend the running of prescription, the ultimate issue is the reasonableness of plaintiffs inaction. Marin, 09-2368 at p. 15, 48 So.3d at 246.
In denying the Defendants’ exceptions of prescription, the trial court implicitly found that Mr. Alexander’s actions—failing to discover the Defendants’ involvement in his 2011 arrest until he received the State’s file in his criminal case—were reasonable. The record supports this factual finding. Although Mr. Alexander acknowledged he was aware of the Times-Picayune newspaper article published the day following his arrest, the article failed to state that the affidavit to which it made reference was the arrest warrant affidavit prepared by Captain Smith of the St. Charles Parish Sheriffs Office in June 2011. Regardless, we decline to impute to Mr. Alexander knowledge from the article of the information that served |27as the basis for the charge against him in St. Charles Parish, which resulted in his arrest.
As noted, the record reflects that Mr. Alexander did not receive the State’s file in his criminal case until December 19, 2012, when the district court judge in his criminal case ordered the State to turn over their file to him. According to Mr. Alexander, there was information in the State’s file that he had never seen before. Given these particular circumstances, we cannot conclude the trial court was manifestly erroneous in finding the discovery doctrine (contra non valentem) applied to suspend prescription as to Mr. Alexander’s defamation claim arising out of the Defendants’ 2011 actions. We thus find this claim is not prescribed.
In sum, we find neither the continuing tort nor the contra non valentem doctrine *563 applies to suspend prescription as to the Defendants’ pre-2011 actions—the February and March 2009 actions. Thus, those claims are prescribed. For the same reason we find the abuse of process claim prescribed. We further find that the contra non valentón doctrine applies to suspend prescription as to Mr. Alexander’s defamation claim arising out of the Defendants’ 2011 actions. As to that defamation claim, we find prescription was suspended until December 19, 2012. Since Mr. Alexander filed suit within the one-year of that date (on January 14, 2013), we find his defamation claim based on the Defendants’ 2011 actions is not prescribed.
(ii) Defamation
| p.sSince we found that Mr. Alexander’s defamation claim as to the Defendants’ 2011 actions—the dissemination of the cease and desist letter to the St. Charles Parish Sheriffs Office, resulting in Mr. Alexander’s arrest—is not prescribed, we now address the merits of that claim.
The Defendants contend that Mr. Alexander’s defamation claim fails because statements made in the cease and desist order were true and thus not defamatory. See Bell v. Rogers, 29,757, p. 7 (La. App. 2 Cir. 8/20/97), 698 So.2d 749, 755 (citing Martin v. Lincoln Gen. Hosp., 588 So.2d 1329, 1333 (La. App. 2d Cir. 1991)) (holding that “[t]ruth is an absolute defense to an action for defamation.”). The defendants further contend that the disclosure was also conditionally privileged.
“ ‘Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury.’ ” Costello v. Hardy, 03-1146, p. 12 (La. 1/21/04), 864 So.2d 129, 139 (quoting Trentecosta v. Beck, 96-2388, p. 10 (La. 10/21/97), 703 So.2d 552, 559). The Louisiana Supreme Court in Costello further noted the following:
In Louisiana, defamatory words have traditionally been classified into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. Lemeshewsky v. Dumaine, 464 So.2d 973, 975 (La.App. 4 Cir.1985). Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one’s personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se. Kosmitis [v. Bailey], 28,585[, p.] 4 [ (La. App. 2 Cir. 12/20/96) ], 685 So.2d [1177,] 1180; Lemeshewsky, 464 So.2d at 975; 12 Crawford, LOUISIANA CIVIL LAW TREATISE: TORT LAW § 17.8 at 315. When a plaintiff proves publication of words that are defamatory per se, the elements of falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Kosmitis, 28,585 at 4, 685 So.2d at 1180. The element of injury may also be presumed. Id.
Costello, 03-1146 at pp. 13-14, 864 So.2d at 140 (footnotes omitted).[20]
*564 In the present matter, it is undisputed that the Defendants transmitted the cease and desist order, which accused Mr. Alexander of violating the P.I. Statutes, to Captain Smith. Mr. Englade testified at trial that the Board never decided whether Mr. Alexander was exempt from the private investigator license (“P.I. License”) requirement before issuing the cease and desist order. He further testified that that he instructed Del Hahn—the Board’s investigator—to handle most of the communications between the Board and Captain Smith. Mr. Hahn testified that although he did not know what work Mr. Alexander was conducting for the School Board and whether it would be exempt from the P.I. License requirement, he nonetheless urged Captain Smith to prosecute Mr. Alexander.
According to Captain Smith’s trial testimony, Mr. Englade contacted him and explained that if Mr. Alexander was investigating, he was doing so without a |anP.L License and that Mr. Alexander should be arrested.[21] He further testified that Mr. Englade failed to mention the exemptions to the P.I. Statutes. Captain Smith stated that, in addition to the cease and desist order, he received from Mr. Hahn the table of contents for the P.I. Statutes and the statute providing the penalties for violating the P.I. Statutes. Captain Smith further testified that the probable cause affidavit and the resulting arrest of Mr. Alexander were the result of a combination of the cease and desist order, a newspaper article about Mr. Alexander, and the applicable law provided by Mr. Hahn, Captain Smith testified that if he had received any information regarding the exemptions from the Defendants, he likely would have consulted the District Attorney*s office before seeking an arrest warrant.
Mr. Alexander admitted that he allowed his P.I, License to expire and that he did not renew it. He claimed, however, that he was working pursuant to the exemptions listed under La. R.S. 37:3503. As noted above, the Defendants did not know whether Mr. Alexander was exempt from the P.I. License requirement before issuing the cease and desist order and transmitting a copy to Captain Smith. The Defendants, therefore, failed to prove that the statements contained in the cease and desist order were true. For these reasons, we find the Defendants’ actions amounted to defamation per se.
| iiiThe Defendants also contend that the disclosure of the cease and desist order to Captain Smith was conditionally privileged. The Louisiana Supreme Court in Kennedy v. Sheriff of E. Baton Rouge, 05-1418, p. 22 (La. 7/10/06), 935 So.2d 669, 684, outlined the conditional privilege as follows:
[W]e held that, at least insofar as the privilege respecting reports of governmental proceedings and activities is concerned, the privilege is abused if the publisher (a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity. Trentecosta, 96-2388 at 20 n. 16, 703 So.2d at 564 n. 16. In other words, since Trentecosta, mere negligence as to falsity (or lack of reasonable grounds for believing the statement to be true) is no longer sufficient to prove abuse of the conditional privilege. Instead, knowledge or reckless disregard as to falsity is necessary for this purpose.
Id. The Supreme Court in Trentecosta noted that “a qualified or conditional privilege *565 exists in Louisiana to report the fact that a person was arrested and the charges for which the person is being held, provided that the report does not assume the guilt of the accused person and is not otherwise defamatory.” Trentecosta, 96-2388 at p. 19, 703 So.2d at 564 (citing Francois v. Capital City Press, 166 So.2d 84 (La. App. 3d Cir.1964)).
The Defendants recklessly disregarded whether Mr. Alexander was in violation of the P.I. Statutes by not informing Captain Smith of the exemptions that may have applied to Mr. Alexander’s work. Furthermore, given our findings that the Defendants acts and omissions constituted willful, wanton, and reckless misconduct,[22] the conditional privilege does not apply to Defendants actions. Accordingly, we find that this assignment of error unpersuasive.
_J^(iii) Immunity
The Defendants next contend that the trial court erred by failing to find they were immune from liability. The Defendants contend that Mr. Englade is entitled to immunity from individual liability under La. R.S. 9:2792.4,[23] and that the Defendants are entitled to discretionary immunity under La. R.S. 9:2798.1(B) and (C)[24] and quasi-judicial immunity.
| asUnder La. R.S. 9:2792.4, individual immunity does not apply to directors of state boards, who are acting in good faith within the scope of their official duties, when their acts cause injury or damage by willful or wanton misconduct Similarly, La. R.S. 9:2798.1 provides that discretionary immunity does not apply when the acts or omissions of a public entity or its employees constitute willful or reckless misconduct. Appellate courts have defined these types of misconduct as follows:
The terms ‘willful’, ‘wanton’, and ‘reckless’ have been applied to that degree of fault which lies between intent to do wrong, and the mere reasonable risk *566 of harm involved in ordinary negligence. These terms apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if harm was intended. The usual meaning assigned to do (sic) the terms is that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow. (Citations omitted).
Haab v. East Bank Consolidated Special Service Fire Protection District of Jefferson Parish, 13-954, p. 10 (La. App. 5 Cir. 5/28/14), 139 So.3d 1174, 1181-82 (quoting Cates v. Beauregard Elec. Co-op., Inc., 316 So.2d 907, 916 (La. App. 3d 1975)).
In the present matter, the parties stipulated at trial that Mr. Englade was acting within the course and scope of his employment as the Board’s executive director. The Defendants, however, contend that the record does not support a finding that Mr. Alexander’s damages were caused by Mr. Englade’s willful or wanton misconduct.
|S4As discussed above, Mr. Englade contacted Captain Smith and explained that if Mr. Alexander was investigating, he was doing so without a P.I. License and that Mr. Alexander should be arrested. Mr. Hahn, on behalf of the Defendants, transmitted the cease and desist order to Captain Smith claiming that Mr. Alexander was in violation of Louisiana law. Neither Mr. Hahn nor the Defendants discussed any exemptions to the P.I. License requirement that may have applied to Mr. Alexander’s work with the School Board. Rather, Mr. Hahn encouraged Captain Smith to prosecute Mr. Alexander. After hearing all the testimony at trial, the jury concluded that the Defendants were not entitled to discretionary immunity. Furthermore, the trial court denied the Defendants’ motion for new trial in which the Defendants sought immunity under La. R.S. 9:2792.4 and La. R.S. 9:2798.1, as well as the application of quasi-judicial immunity-
Given the Defendants’ transmission of the cease and desist order coupled with the Defendants’ and Mr. Hahn’s insistence to arrest Mr. Alexander without providing any law in support or any information regarding possible exemption status, the Defendants’ acts and omissions constituted willful, wanton, and reckless misconduct. The trial court, -thus, was not manifestly erroneous in rejecting the Defendants’ argument that they were entitled to immunity under either La. R.S. 9:2792.4 or La. R.S. 9:2798.1. Given our findings of the Defendants’ misconduct leading to Mr. Alexander’s arrest, we also find that the Defendants are not entitled Lfito quasi-judicial immunity.[25] Accordingly, we find *567 that this assignment of error unpersuasive.
(iv) Excessive damages
The Defendants contend that the jury’s award of $300,000 in damages was excessive.[26] The Defendants, however, failed to cite any authority in support of their assertion that the damages are excessive; rather, they merely point out all of Mr. Alexander’s convictions and allege that his reputation was “already tarnished and compromised.”
lRfiWhen reviewing the trial court’s damage awards, the following standard applies:
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it “shocks the conscience”. Moore v. Healthcare Elmwood, Inc., 91-0041 (La.App. 5 Cir. 6/5/92), 582 So.2d 871.
State Farm Mut. Auto. Ins. Co. v. LeRouge, 07-0918, pp. 30-31 (La. App. 4 Cir. 11/12/08), 995 So.2d 1262, 1281. This court has also noted the following:
[A]n award of damages in a defamation case is left to the great discretion of the trier of fact and should not be disturbed absent a showing of manifest error. Sommer [v. State, Dep’t of Transp. & Dev.], 97-1929, p. 17 [ (La. App. 4 Cir. 3/29/00)], 758 So.2d [923,] 934-35. The reviewing court must find that the trier of fact abused its discretion in awarding damages. “[T]he award must be so high or so low in proportion to the injury that it ‘shocks the conscience.’ ” Id. Further, the reviewing court must determine not whether the trier of fact is right or wrong, but whether the trier of fact’s conclusion is a reasonable one. Zito [v. Advanced Emergency Medical Services, Inc.], 11-2382, p. 4 [ (La.5/8/12) ], 89 So.3d [372,] 375. “If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Id.
Damages for defamation include both special damages and nonpecuniary or general damages. Connor v. Scroggs, 35,521, p. 14 (La. App. 2 Cir. 6/12/02), 821 So.2d 542, 552. This court has held that general damages for defamation can include injury to reputation, personal humiliation, embarrassment, mental anguish, and suffering. Sommer, 97-1929 at p. 47, 758 So.2d at 948-49.
Thompson v. Bank One of Louisiana, NA, 13-1058, p. 19 (La. App. 4 Cir. 2/26/14), 134 So.3d 653, 666. “[E]ven when no special damages are claimed and the defamatory statements have had little or no adverse effect on the plaintiffs reputation, damages are recoverable for the plaintiffs own embarrassment, humiliation, anxiety or *568 hurt feelings resulting from the defamation.” Bell, 29,757 at p. 6, 698 So.2d at 754-55; see also Steed v. St. Paul’s United Methodist Church, 31,521, p. 15 (La. App. 2 Cir. 2/24/99), 728 So.2d 931, 942 (noting that, in 1999, damages for defamation in reported cases run as high as $150,000.00).
Although we find Mr. Alexander’s defamation claims based on the Defendants’ 2009 actions and his abuse of process claim have prescribed,[27] Mr. Alexander stated a defamation claim based on the Defendants’ 2011 actions that resulted in his arrest in St. Charles Parish. Following Mr. Alexander’s arrest, the St. Charles Parish District Attorney’s Office charged him with “doing private investigation work without a license.” Mr. Alexander testified that multiple newspapers published articles regarding his arrest. He testified at trial that he suffered damage to his reputation and the loss of business as a result of the 2011 arrest. He further testified that his reputation is now “scorned ... [and] tainted forever.” Mr. Alexander also testified that following his arrest, his business suffered and that he lost a substantial amount of income. He explained that he rarely has any process serving jobs and that no one will hire him for workers’ compensation investigation work.
Based on our review of the record, we cannot conclude it was manifestly erroneous for the jury to award Mr. Alexander $300,000 in damages for his pain and suffering, loss of reputation, and embarrassment. Accordingly, we find that this assignment of error unpersuasive.
|SR(v) Communication with the jury
On appeal, Mr. Alexander contends that the judge entered the jury room to discuss with the jury, off the court record, regarding questions the jury had about the jury instructions. Mr. Alexander thus contends that the matter should be remanded for a new trial.
Generally, it is improper for a trial judge to engage in ex parte communication with the jury. Delo Reyes v. Liberty Mut. Fire Ins. Co., 08-0769, p. 3 (La. App. 4 Cir. 2/18/09), 9 So.3d 890, 892 (citing La. C.C.P. art. 1796 and Jones v. Black, 95-2530 (La. 6/28/96), 676 So.2d 1067). Here, the Defendants do not dispute that the trial judge had ex parte communications with the jury; rather, the Defendants argue that Mr. Alexander failed to object on the record when it occurred at trial.[28] See Taylor v. Tulane Med. Ctr., 98-1967, p. 21 (La. App. 4 Cir. 11/24/99), 751 So.2d 949, 962 (finding that “the plaintiffs failure to object to the manner of polling the jury, either at the time it was announced by the trial court or at any time during the polling, along with plaintiffs’ counsel’s comment that such polling Vould help,’ demonstrates that the plaintiff acquiesced in the manner in which the jury was polled.”).
|33The record reflects that counsel for Mr. Alexander suggested that the trial judge communicate with the jurors. Indeed, the following colloquy occurred on the record between the parties and the judge:
*569 MR. HARVEY [COUNSEL FOR MR. ALEXANDER]:
Maybe you should ask them what specific part of the law.
THE COURT:
I can go in there and ask them with your permission?
MR. HARVEY:
Yes. Judge, remember you put the private law in there. Maybe you should ask what specific parts do you want. I bet you $5 it is exemption. I think it is best if you go by yourself.
THE COURT: All right. I will go back and report to you.
After lengthy discussions on the record regarding the jury interrogatories, the parties and the trial judge continued:
THE COURT:
And so I will tell the jurors that that [sic] was simply an error. That is not related to defamation. If that is okay with everyone?
MR. HARVEY:
Yes.
MR. PHAYER [COUNSEL FOR THE DEFENDANTS]:
Yes.
THE COURT:
All parties agree.
LoMr. Alexander not only failed to object at trial, but he acquiesced that the trial judge’s ex parte communications with the jury. We thus find that he failed to preserve the right to raise this issue on appeal.
(vi) Motions for new trial
Mr. Alexander contends that the trial court erred in denying his motions for new trial. After the trial court entered judgment in Mr. Alexander’s favor in accordance with the jury verdict, Mr. Alexander filed a motion for new trial for the numerous reasons. The only issues before this court on appeal, however, are juror misconduct and improper jury instructions, which we separately address.[29]

Juror misconduct

Mr. Alexander contends that the trial court erred in denying his motion for new trial based on the jury misconduct that occurred during trial and deliberations. First, Mr. Alexander alleges that Juror 23, an attorney employed at Phelps Dunbar, failed to disclose that the State of Louisiana was one of her law firm’s clients. He maintains that had this information been disclosed during voir dire, he would have exercised a challenge for cause.
141 Pursuant to La. C.Cr.P. art. 1765(3), a juror may be challenged for cause “[w]hen the relations whether by blood, marriage, employment, friendship, or enmity between the juror and any party or his attorney are such that it must be reasonably believed that they would influence the juror in coming to a verdict.” La. C.Cr.P. *570 art. 1765(3). As the Defendants point out, Juror 23 was advised that this case involved a state agency; yet, during voir dire, Juror 23 did not express any concerns about her ability to be impartial.[30] Furthermore, the record reflects that Phelps Dubar represents the State of Louisiana in one case in CDC. The record is void of any information that indicates Juror 23 is an attorney of record for the State of Louisiana.
Second, Mr. Alexander also contends that Juror 23, who was also the jury foreman, brought outside influence into the jury room and gave her own personal interpretation of the law to the jurors. In support thereof, Mr. Alexander submits an affidavit from another juror. The affiant stated that Juror 23, whom the other jurors knew was an attorney, read the jury instructions to other jurors and attempted to explain what the instructions meant. The affiant further stated that Juror 23 mentioned several times that she was making assumptions regarding what the attorney meant. Lastly, the affiant stated that after the judge explained there was a mistake on the jury form, Juror 23 drew on the form but never showed the form to the other jurors.
142At the hearing on the motion, the trial court noted that “[t]he affidavit is not ae-cepted because the affidavit really does not show extraneous influence on this juror.” The trial court, thereafter, denied Mr. Alexander’s motion for new trial.[31]
“A decision to deny a motion for new trial based upon jury misconduct is reviewed pursuant to an abuse of discretion standard.” Uriegas v. Gainsco, 94-1400, p. 13 (La. App. 3 Cir. 9/13/95), 663 So.2d 162, 170 (citing Wright v. Hirsch, 560 So.2d 835 (La. 1990)). It is well-settled that affidavits by jurors cannot be used as evidence to impeach their verdict. La. C.E. art. 606(B);[32] Uriegas, 94-1400 at p. 14, 663 So.2d at 170. The mover has the burden of proving the level of behavior was of such a grievous nature as to preclude the impartial administration of justice. Williams v. Super Trucks, Inc., 36,993, p. 15 (La. App. 2 Cir. 4/9/03), 842 So.2d 1210, 1221. Furthermore, the jurisprudence has recognized that invasive scrutiny of a juror’s individual deliberation or investigation of a jury’s collective reasoning for reaching a verdict are disfavored in the law as a matter of public policy. Williams, 36,993 at p. 16, 842 So.2d at 1221 (citing Uriegas, supra). The court mJ^Williams further noted that “[t]he evidence of strong opinions from one or two jurors about lawsuits is not enough to show that the jury behaved so improperly that Plaintiffs were *571 prevented from receiving impartial justice.” Williams, 36,993 at p. 17, 842 So.2d at 1222.
Mr. Alexander claims that one juror observed jury misconduct. Based on the record before us, we do not find that any member of the jury behaved so grievously as to prevent Mr. Alexander from receiving impartial justice. Hence, we find that the trial court did not abuse its discretion in denying Mr. Alexander’s motion for new trial based on jury misconduct.

Improper jury instructions

Mr. Alexander contends that the jury verdict form and jury charges were misleading and confusing and contrary to the law. According to Mr. Alexander, the jury’s questions throughout deliberation support this contention. He further contends that due to the improper jury instructions, the jury rendered a verdict that is clearly contrary to the law and evidence, which, he claims, is another basis for granting a new trial. See La. C.C.P. art. 1972(1).[33]
The Defendants counter that Mr. Alexander failed to object to the jury instructions at trial; thus, he failed to preserve the issue for appeal. See La. C.C.P. art. 1793(C);[34] see also Willis v. Ochsner Clinic Found., 13-627, p. 14 (La. App. 5 Cir. 4/23/14), 140 So.3d 338, 349 (finding that the failure of a party to timely object to the jury charges or to the interrogatories at trial precludes that party from making such a claim on appeal). We agree.
The record reflects that Mr. Alexander’s counsel failed to object to the jury charges or to the jury interrogatories. Rather, Mr. Alexander’s counsel stated the following: “[w]e have reviewed the jury charges and jury interrogatories with the Judge and have no objections.” Insofar as for the verdict being contrary to the law, the jurisprudence recognizes that the trial court has wide discretion in determining whether the evidence is contrary to the law and evidence. Guillory v. Lee, 09-0075, p. 38 (La. 6/26/09), 16 So.3d 1104, 1131 (citing Martin v. Heritage Manor South Nursing Home, 00-1023, p. 3 (La. 4/3/01), 784 So.2d 627, 630).
The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. Id. Furthermore, the Louisiana Supreme Court stated the following:
The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is in the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury’s responsibility. A motion for new trial solely on the basis of being | ^contrary to the evidence is directed squarely at the accuracy of the jury’s factual determinations and must be viewed in that light. Thus, the jury’s verdict should not be set aside if it is *572 supportable by any fair interpretation of the evidence.
Id. (quoting Davis v. Wal-Mart Stores, Inc., 00-0445, p. 10 (La. 11/28/00), 774 So.2d 84, 93).
Therefore, we do not find that the trial court abused its discretion in denying Mr. Alexander’s motion for new trial.
(vii) Petition to annul jury verdict
Mr. Alexander contends that the trial court erred in granting the Defendants’ motion for summary judgment and dismissing his petition to annul the jury verdict. In support, Mr. Alexander contends that the Defendants committed perjury, fabricated evidence, withheld evidence, and participated in witness tampering during the underlying trial. We summarize Mr. Alexander’s claims to annul the jury verdict as follows:
• Mr. Englade testified for the first time in litigation, contrary to his discovery deposition, that the cease and desist order was actually based on a complaint made by Mr. Alexander’s sister-in-law in 2006.
• Mr. Englade testified that a cease and desist order was signed in 2007 and issued to Mr. Alexander, but they were returned as undeliverable. Since the Defendants were unable to produce the 2007 cease and desist order and the returned envelopes, Mr. Alexander contends the Defendants fabricated evidence.[35]
• Mr. Englade testified during trial that he did not maintain a personal file regarding Mr. Alexander. It was later discovered, however, that Mr. Englade had a personal file but that it was placed with the Board’s file on Mr. Alexander.
[I(!* After the trial court ordered the production of the personal file, Mr. Alexander discovered two documents that had not been produced in discovery: (1) an affidavit of Captain Smith, a non-party witness; and (2) correspondence to Captain Smith from Mr. Hahn, another non-party witness.
A final judgment obtained by fraud or ill practices may be annulled by filing a nullity action. See La. C.C.P. art. 2004.[36] The jurisprudence provides that a judgment is subject to nullification if the following two criteria are met: (1) the circumstances under which the judgment was rendered showed the deprivation of legal rights of the litigant seeking relief; and (2) enforcement of the judgment would be unconscionable and inequitable. Expert Oil & Gas, L.L.C. v. Mack Energy Co., 16-0068, p. 4 (La. App. 1 Cir. 9/16/16), 203 So.3d 1080, 1083-84 (citation omitted). “ ‘Deprivation of a legal right’ is defined as ‘conduct which prevents an opposing party from having an opportunity to appear or to assert a defense.’ ” Wilson v. Wilson, 15-74, p. 10 (La. App. 5 Cir. 4/29/15), 170 So.3d 340, 347 (citing Kem Search, Inc. v. Sheffield, 434 So.2d 1067, 1070 (La. 1983)). An action for nullity “is not intended as a substitute for an appeal or as a second chance to prove a claim that was previously denied for faitee of proof, it is imperative that courts review a petition for nullity closely. The purpose of an action for nullity is to prevent injustice which cannot be *573 corrected through new trials and appeals.” Expert Oil & Gas, L.L.C., 16-0068 at p. 4, 203 So.3d at 1083 (citing Belle Pass Terminal, Inc. v. Jolin, Inc., 01-0149 (La. 10/16/01), 800 So.2d 762, 766); see also Kem Search, Inc., supra.
Newly discovered evidence which could have been presented at the original trial cannot serve as the basis for an action for nullity. Gladstone v. Am. Auto. Ass’n, Inc., 419 So. 2d 1219, 1222 (La. 1982); see also Midland Funding, LLC. v. Cady, 47,-854, p. 5 (La. App. 2 Cir. 2/27/13), 110 So.3d 656, 659. “[T]here has to be some allegation that the one seeking the annullment [sic] did not know at the time the evidence was taken that the testimony was false, or else that if he knew it was false, he did not have the means at that time or the opportunity of contradicting this evidence.” Cryer v. Cryer, 70 So.2d 752, 754 (La. App. 1st Cir. 1954).
The Defendants deny Mr. Alexander’s allegations of wrongdoing. Nonetheless, the Defendants contend that even assuming, arguendo, the allegations were true, Mr. Alexander and his counsel were aware of these alleged misdeeds at the time of trial. The Defendants thus contend that Mr. Alexander should have moved for a mistrial rather than wait until after a jury verdict was rendered.
In its reasons for judgment, the trial court found as follows:
Counsel had an arsenal of contradictory evidence to use against Mr. Englade. He had his deposition, his affidavit and the Sister-in-law complaint. The yellow folder contained an alternative affidavit from Lt. Smith. Lt. Smith testified at trial. His testimony was consistent with the documents produced by Mr. Alexander in support of his motion for partial summary judgment. There was no evidence presented by Mr. Alexander that his testimony was coerced, false or given under threat. This court found that there was no issue of fact in | ^dispute on defendant’s [sic] motion for summary judgment, (footnote omitted).[37]
Upon review of the record, we cannot conclude that Mr. Alexander was deprived of a legal right. He was provided the opportunity to address the multiple issues in the trial court. We thus find no error in the trial court’s ruling granting the Defendants’ motion for summary judgment and dismissing Mr. Alexander’s petition to annul the jury verdict.
DECREE
For the foregoing reasons, the judgment of the trial court is amended and affirmed. The judgment is amended to reflect our finding that Mr. Alexander’s claim is prescribed in two respects. First, insofar as Mr. Alexander’s claims are based on the Defendants’ pre-2011 actions (the February and March 2009 actions), those claims are prescribed. Second, Mr. Alexander’s abuse of process claim, which is not premised on the Defendants’ 2011 actions, is prescribed. Our amendment, however, has *574 no effect on the damage award. Accordingly, we affirm the trial court’s judgment.
AMENDED AND AFFIRMED
McKAY, C.J., CONCURS IN THE RESULT
LOBRANO, J., CONCURS IN THE RESULT
JENKINS, J., DISSENTS WITH REASONS

. La. R.S. 37:3503(8) provides in pertinent part as follows:
(a) "Private investigator” or "private detective” means any person who holds out to the general public and engages in the business of furnishing or who accepts employment to furnish information or who agrees to make or malees an investigation for the purpose of obtaining information with reference to the following:
•Is ¾' sfc
(b) This definition shall not include any of the following:
(i) Insurer employees or agents and insur-anee adjusters or claims agents who make appraisals for the monetary value or settlement of damages or monetary value or settlement of personal injuries.
[[Image here]]
(iv) An attorney at law licensed to practice in this state and his employees.
* # *
(viii) A person or corporation which employs persons who do private investigative work in connection with the affairs of such employer exclusively and who have an employer-employee relationship with such employer. Neither such persons or corporations nor their employees shall be required to register or be licensed under this Chapter.

. The letter indicates that copies were mailed to the New Orleans City Attorney, the Interim Inspector General, CCMSI, the State Attorney General, the Orleans Parish District Attorney's Office, Metropolitan Crime Commission, New Orleans City Attorney’s Office of Risk Management Unit, the United States Attorney for the Eastern District of Louisiana, and Lee Zurik at WWL-TV.

. The date and cause of the contract termination was a disputed issue of fact at trial.

.Jerry Armatis, Carl Ayestas, and Thomas Brechtel—all affiliates of CCMSI—-were also named as defendants in that suit. The record also reflects that, between 2009 and 2013, Mr. Alexander, individually and through his company, filed several more lawsuits against CCMSI, the City, and other individuals in relation to the termination of his DBE contract.

. The arrest warrant affidavit states that the investigation into Mr. Alexander began when the School Board received information about Mr. Alexander from the MCC; the MCC informed the School Board Superintendent that Mr. Alexander had been issued a cease and desist in 2009 by the Board; and he had several previous felony convictions, some of which had been expunged; the School Board Superintendent then contacted the St. Charles Parish Sheriff’s Office and requested that an investigation be conducted as to whether Mr. Alexander had a valid private investigator license at the time he performed work for the School Board. The affidavit then states that Captain Smith received paperwork from the Board regarding Mr. Alexander, including a copy of the cease and desist order; and he was told that if Mr. Alexander had conducted any private investigation work without a license, then he was in violation of La. R.S. 37:3520.

. La. R.S. 37:3520 provides, in pertinent part,
A. It shall be unlawful for any person knowingly to commit any of the following acts:
(1) Provide contract or private investigator service without possessing a valid license.
[[Image here]]
(6) Violate any provision of this Chapter or any rule or regulation of the board.

. This court denied the Defendants' writ application seeking review of the trial court’s October 16, 2013 judgment denying their exceptions of no cause of action and prescription. Dwayne Alexander v. La. State Bd. of Private Investigator Examiners, et al., 13-1438 (La. App. 4 Cir. 2/20/14) (unpub.).

. The Defendants assert the following assignments of error:
1. The trial court erred in denying defendants’ motion for summary judgment and motion for directed verdict, and in entering judgment in plaintiffs favor following trial, because plaintiff s claims were prescribed.
2. The trial court erred in denying defendants' motion for summary judgment, in entering judgment in plaintiffs favor following trial, and denying defendants’ motion for new trial, because defendants are immune from liability under La. R.S. 9:2792.4, the doctrine of discretionary immunity, and the doctrine of quasi-judicial immunity.
3. The judgment in Mr. Alexander’s favor on the defamation claim was contrary to law and the evidence, as the alleged defamatory statements were both true and conditionally privileged.
4. The jury awarded excessive damages, in light of the undisputed evidence regarding Mr. Alexander’s reputation, character, and background,
5. The judgment in Mr. Alexander’s favor on the abuse of process claim was contrary to law and the evidence, as Mr. Alexander failed to carry his burden of proof on this claim.

. Mr. Alexander asserts the following assignments of error:
1. The trial judge court erred by entering jury deliberations several times to advise the jury on substantive issues.
2. The trial court abused its discretion in denying his motions for new trial,
3. The trial court erred in granting the Defendants’ motion for summary judgment and dismissing his petition to annul based on fraud.

. See Farber v. Bobear, 10-0985 (La.App. 4 Cir. 1/19/11), 56 So.3d 1061 (holding that defamation sounds in tort and is thus subject to the one-year prescriptive period); Warren v. Getter, 924 F.Supp.2d 713, 727 (E.D. La. 2013) (holding that abuse of process is an intentional tort subject to the one-year prescriptive period); Alcorn v. City of Baton Rouge, 02-0952 (La.App. 1 Cir. 12/30/04), 898 So.2d 385 (same).

.Under the manifest error standard of review, the appellate court reviews the entire record to determine whether a reasonable factual basis exists for the trial court’s findings. Lomont, 14-2483 at p. 8, 172 So.3d at 627 (citing Rando v. Anco Insulations Inc., 08-1163, p. 20 (La. 5/22/09), 16 So.3d 1065, *556 1082). The appellate court should not disturb the trial court’s findings unless the record establishes that those findings are manifestly erroneous or clearly wrong. Rando, 08-1163 at p. 20, 16 So.3d at 1082; Stobart v. State, through DOTD, 617 So.2d 880, 882-82 (La. 1993). When two permissible views of the evidence are presented, the fact finder's choice between them cannot be manifestly erroneous. Robert v. Robert Management Co., LLC, 14-0822, pp. 14-15 (La.App. 4 Cir. 2/11/15), 164 So.3d 922, 933; Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). If, however, "documents or objective evidence so contradict a witness' story, or the story is itself so internally inconsistent or implausible on its face” then the appellate court may conclude that a trial court's finding is manifestly erroneous or clearly wrong. Robert, 14-0822 at p. 15, 164 So.3d at 933; McCaskill v. Rosiere, 09-0323, p. 3 (La.App. 4 Cir. 8/24/09), 20 So.3d 496, 499,

. In this case, the Defendants raised the exception of prescription four times before the submission of the case to the jury. The record reflects that at the trial court hearings on the Defendants' first and second set of exceptions, no evidence or testimony was introduced regarding the exception of prescription; the trial court overruled the exception without reasons. When the Defendants re-urged the exception of prescription as part of their motion for summary judgment, the Defendants introduced deposition testimony and other documentaty evidence in support of the exception. In denying the exception at the September 20, 2013 hearing, the trial court did not make specific findings or give reasons.

. When the operating cause of injury is continuous and gives rise to successive damages, prescription does not commence to run until the injury-causing conduct abates. Crump, 98-2326 at p. 7, 737 So.2d at 726 (citing South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531, 533 (La. 1982)); Scott, 14-0726 at p. 11, 157 So.3d at 786. In contrast, "[w]hen the operating cause of the injury is 'not a continuous one of daily occurrence', there is a multiplicity of causes of action and of corresponding prescriptive periods.’ ’’ Crump, 98-2326 at p. 7, 737 So.2d at 726 (quoting A.N. Yiannopoulos, PREDIAL SERVITUDES, § 63 (1983)). Thus, when the operating cause of injury is discontinuous, even if the plaintiff continues to experience ill effects or injury from the original, wrongful act, the continuing tort doctrine is inapplicable; and "prescription runs from the date that knowledge of such damage was apparent or should have been apparent to the injured party.” Crump, 98-2326 at p. 7, 737 So.2d at 726; Hogg v. Chevron USA, Inc., 09-2632, 09-2635, p. 21 (La. 7/6/10), 45 So.3d 991, 1005; Scott, 14-0726 at p. 12, 157 So.3d at 787.

. See LeJeune Brothers, Inc. v. Goodrich Petroleum, Co., L.L.C., 06-1557 (La. App. 3 Cir. 11/28/07), 981 So.2d 23; Perrilloux v. Stilwell, 00-2743 (La. App. 1 Cir. 3/28/02), 814 So.2d 60; Estate of Patout v. City of New Iberia, 01-0151 (La. App. 3 Cir. 4/3/02), 813 So.2d 1248; South Central Bell, supra; Mouton v. State of Louisiana, 525 So.2d 1136 (La. App. 1 Cir. 1988); Derbofen v. T.L. James & Company, Inc., 355 So.2d 963, 968 (La. App. 4 Cir. 1977).

. In Risin, this Court held that the defendant/landlord’s failure to act to correct the problem of lead paint in plaintiff’s house constituted a continuing tort. Under the facts of that case, this Court found that defendant had an ongoing duty to provide its tenant with safe housing and defendant’s failure to act to remove the injury-causing object (the lead paint) resulted in continuing damages to plaintiff. Also under the facts presented in *559 Lopez this Court found that defendants failure to act to remove or repair the original injury-causing object'—a damaged building leaning onto plaintiffs property—resulted in continuing damages to plaintiff and constituted a continuing tort.

. The jurisprudence has recognized the doctrine of contra non valentem doctrine as an exception to the running of prescription when the circumstances of a case fall into one of the following four categories: (1) when there was some legal cause preventing the courts or their officers from taking cognizance of or acting on plaintiffs action; (2) when there was some condition coupled with the contract or connected to the proceedings preventing the creditor from suing or acting; (3) when the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) when the cause of action is not known or reasonably knowable by plaintiff, even though this ignorance is not induced by defendant. See Wells v. Zadeck, 11-1232, pp. 8-9 (La. 3/30/12), 89 So.3d 1145, 1150; Renfroe v. State ex rel. Dept. of Transp. and Development, 01-1646, pp. 8-9 (La. 2/26/02), 809 So.2d 947, 953; Plaquemines Parish Commission Council v. Delta Development Company, Inc., 502 So.2d 1034, 1056 (La. 1987). The Louisiana Supreme Court cautions, however, that the doctrine of contra non valentum only applies in “exceptional circumstances.” Marin v. Exxon Mobil Corp., 09-2368, p. 13, (La. 10/19/10), 48 So.3d 234, 245 (citing Renfroe, supra); State ex rel. Div. of Admin. v. McInnis Brothers Construction, Inc., 97-0742, p. 3 (La. 10/21/97), 701 So.2d 937, 940.

. Mr, Alexander’s tort claims are premised on the Defendants’ issuance and dissemination of a cease and desist letter and the disclosure of his expunged criminal records.

. Mr. Alexander testified that on or around February 19, 2009, he was called into a meeting with Jerry Armatis of CCMSI. At that meeting, he learned that Mr. Centanni had compiled a binder of information on plaintiff that Mr. Centanni had sent to CCMSI and various other people. He further testified that he looked through the binder and noted it contained his expunged criminal records, his Social Security number, his checking account information, and a multitude of other personal and professional information about him. On cross-examination, he acknowledged that Mr. Centanni, not the Board, had compiled the information on him and disseminated the binder to the Board and others, as reflected by the cover letter dated February 16, 2009. He also testified that Mr. Armatis gave him the binder at the meeting and he has known of its contents since the day of that meeting on or around February 19, 2009. A review of the Centanni Binder reveals that Mr. Centan-ni conducted a "background investigation” on Mr. Aleander and his World Wide Detective Agency using information from various sources, including the Board. The first page of the "Summary of Background Investigation” notes that Mr. Centanni conducted on-line research with the Board regarding Mr. Alexander’s private investigator license and that he obtained records from the Board, which included all of Mr. Alexander's expunged criminal records. Thus, Mr. Alexander knew that the Board had wrongfully disclosed his expunged criminal records to Mr. Centanni when he received the binder at the meeting in February 2009.

. Mr. Alexander testified that Mr. Englade personally delivered the cease and desist order to him on March 4, 2009, at Mr. Alexander’s probation officer’s office. During cross-examination, Mr. Alexander identified two letters dated May 12, 2009, addressed to the attention of Mr. Englade at the Board and signed by Mr. Alexander. One of the letters refers to Mr. Centanni's public records request in February 2009 and complains that the Board furnished Mr. Centanni with personal and private information from his file with the Board. The letter then states, ”[a]s a result of [Mr. Centanni’s] accusation that I am participating in ‘fraudulent acts’ the Board then issued its cease and desist order and as a result of all of this, I have been prohibited from earing the living that I have been doing with CCMSI over the past nine years.” During cross-examination regarding the two May 12, 2009 letters, Mr. Alexander testified that he was aware as of that date that the Board had provided Mr. Centanni with his personal information and the Board had issued the cease and desist order without a hearing being held or “without due process.” Mr. Alexander also testified that he filed two lawsuits in 2009 related to the Centanni Binder and the termination of his DBE contract with CCMSI. He acknowledged that he filed suit against Mr. Centanni alleging unfair trade practices in connection with Mr. Cen- *561 tanni’s distribution of the binder, and Mr. Alexander filed suit against CCMSI asserting multiple claims relating to the termination of his DBE contract. Mr. Alexander also acknowledged that both suits were dismissed in 2009, and he asserted in his testimony that both cases were dismissed "because of the fabricated cease and desist order.”

. The court in Costello further noted the following:
The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is ultimately a legal question for the court. Sassone [v. Elder], 626 So.2d [345,] 352 [(La. 1993)]. The question is answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense. Id. To be actionable, the words must be communicated or "published” to someone other than the plaintiff. Kosmitis, 25,585 at 3, 685 So.2d at 1180.
Costello, 03-1146 at p. 13, 864 So.2d at 140.

. Mr. Englade testified that he did not recall having a telephone conversation with Captain Smith.

. See "(ill) Immunity” section of this opinion.

. La. R.S. 9:2792.4 provides as follows:
A. As used in this Section, a "member of a board, commission or authority of a political subdivision” means a person serving as an elected or appointed director, trustee, or member of a board, commission, or authority of a municipality, ward, parish, or special district, board, or commission of the state, including without limitation, a levee district, school board, parish law enforcement district, downtown development district, tourist commission, port commission, publicly owned railroad board or commission, or any other local board, commission, or authority.
B. A person who serves as a member of a board, commission, or authority of a political subdivision as defined in Subsection A, shall not be individually liable for any act or omission resulting in damage or injury, arising out of the exercise of his judgment in the formation and implementation of policy while acting as a member of a board, commission, or authority of that political subdivision, provided he was acting in good faith and within the scope of his official functions and duties, unless the damage or injury was caused by his willful or wanton misconduct.

.La. R.S. 9:2798.1(B) and (C) provide as follows:
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

. The Defendants also contend that they are entitled to quasi-judicial immunity regarding the issuance of the cease and desist order to Mr. Alexander. See Menard v. Louisiana Dep’t of Health & Hosps., 11-1487, pp. 5-6 (La. App. 3 Cir. 4/4/12), 94 So.3d 15, 18-19. The court in Menard noted as follows:
The doctrine of judicial immunity extends absolute immunity to a judge from liability for all acts performed within his or her subject matter jurisdiction unless he or she acted outside his or her judicial capacity and his or her actions were based on malice or corruption. Viator v. Miller, 04-1199 (La. App. 3 Cir. 4/27/05), 900 So.2d 1135.
Quasi judicial is defined by Black's Law Dictionary 1121, (5th ed.1979), as:
A term applied to the action, discretion, etc., of public administrative officers or bodies, who are required to investigate *567 facts, or ascertain the existence of facts, hold hearings, and draw conclusions from them, as a basis for their official action, and to exercise discretion of a judicial nature.
Menard, 11-1487 atp. 5, 94 So.3d at 18.

. According to the jury interrogatories attached to the final judgment, the jury awarded the following:
• $125,000.00 for past and future pain and suffering, including mental and emotion;
• $125,000.00 for past and future loss of professional reputation; and
• $50,000.00 for past and future embarrassment.
The jury did not award Mr. Alexander any damages for past and future loss of enjoyment of life and for past lost wages and loss of earning capacity.

. We note that Mr, Alexander’s brief on appeal states that "the jury did not award anything which would seem to relate to abuse of process damages.”

. This court denied Mr. Alexander’s writ application seeking review of the trial court's denial of his motion for new trial on this issue. Dwayne Alexander v. La. State Bd. of Private Investigator Examiners, et al., 15-362 (La. App. 4 Cir. 4/22/15) (unpub.). In denying his writ, this court noted that the issue could be raised on appeal. The Louisiana Supreme Court also denied Mr. Alexander’s writ application. Alexander v. Louisiana State Bd. of Private Investigator Examiners, 15-0992 (La. 9/11/15), 176 So.3d 1040.

. On August 6, 2015, Mr. Alexander contends that the trial court erred in denying his motion for new trial claiming newly discovered evidence. The trial court denied the motion for new trial as untimely. See La. C.C.P. art. 1974 (noting that ‘‘[t]he delay for applying for a new trial shall be seven days ... after the clerk has mailed, or the sheriff has served, the notice of judgment.”). This court denied Mr. Alexander’s application for supervisory writ. Dwayne Alexander v. La. State Bd. of Private Investigator Examiners, et al., 15-1116 (La. App. 4 Cir. 11/3/15) {unpub.). The Louisiana Supreme Court also denied his writ application. Alexander v. Louisiana State Bd. of Private Investigator Examiners, 15-2176 (La. 1/25/16), 185 So.3d 749. By the tíme Mr. Alexander filed his motion for new trial, the Defendants’ appeal to this court had been perfected; therefore, the trial court was divested of jurisdiction to consider the motion for new trial. Accordingly, we decline to consider this issue.

. See Seals v. Pittman, 499 So.2d 114, 119 (La. App. 1st Cir. 1986) (finding that a potential juror who was employed by the defendant but had minimal contact with the defendant was not sufficient to exclude juror for cause).

. This court denied Mr. Alexander’s writ application seeking review of the denial of his motion for new trial on this issue. Dwayne Alexander v. La. State Bd. of Private Investigator Examiners, et al., 15-361 (La. App. 4 Cir. 4/22/15) (unpub.).

. La. C.E. art. 606(B) provides as follows:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

. La. C.C.P. art. 1972(1) provides as follows:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
When the verdict or judgment appears clearly contrary to the law and the evidence.

. La. C.C.P. art. 1793(C) provides as follows:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.

. Since the Defendants were unable to produce this evidence at trial, the trial court gave a spoliation charge, which Mr. Alexander now contends was insufficient.

. La. C.C.P. art. 2004 provides, in pertinent part, as follows:
A. A final judgment obtained by fraud or ill practices may be annulled.
B. An action to annul a judgment on these grounds must be brought within one year of the discovery by the plaintiff in the nullity action of the fraud or ill practices.

. In a footnote, the trial court observed, however, that the only evidence that Mr. Alexander did not have during trial was the 2007 cease and desist order. Mr. Englade testified at trial as to its existence, but it was never produced. The trial court further stated as follows:
It cannot be known whether it would have supported Plaintiff's case had it actually been produced at trial. What is known, is that Plaintiff benefited from an adverse evidentia-ry presumption charge. If this instruction was insufficient, it should have been objected to during the jury charge conference. St. Pierre v. Gen. Am. Transp. Corp., 360 So.2d 595, 597 (La. App. 4 Cir. 1978) ("In connection with charges to the jury, unless an objection is made to proposed charges before the juty retires the objection is waived.”)